# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PETER JOHN WEYKER,

                Petitioner,

v.

CHERYL EPLETT,[1]

                Respondent.

Case No. 13-CV-1115-JPS

**ORDER**

## 1.      INTRODUCTION

On September 30, 2013, Petitioner Peter John Weyker ("Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. Nearly eight years later, he filed an amended petition. ECF No. 29. That amended petition is now before the Court. For the reasons discussed herein, the Court will deny the amended petition.

## 2.      BACKGROUND

### 2.1      Criminal Complaint and Charges

On July 15, 2008, a criminal complaint against Petitioner was filed in *State of Wisconsin v. Peter J. Weyker*, Dodge County Circuit Court Case No. 2008CF000228.[2] Petitioner was ultimately charged with sixteen total

---

[1] Wisconsin offender records provide that Petitioner is currently incarcerated at Oshkosh Correctional Institution, which is overseen by Warden Cheryl Eplett. *See* Offender Locator, Wis. Dep't Corrections, *available at* https://appsdoc.wi.gov/lop/ (last visited June 28, 2023). Accordingly, the Court will instruct the Clerk of Court to replace Jason Benzel with Cheryl Eplett as Respondent in this action.

[2] That criminal docket is available at https://wcca.wicourts.gov/caseDetail.html?caseNo=2008CF000228&countyNo=14 &index=0&mode=details and is cited to herein as "Circuit Court Docket."

counts—for second degree sexual assault of a child, incest with a child, repeated sexual assault of the same child, capturing an image of nudity, and attempt to capture an image of nudity[3]—after Petitioner's daughter ("B.S.") reported to police that Petitioner had sexually assaulted her. *State v. Weyker*, 945 N.W.2d 372, ¶ 3 (Wis. Ct. App. 2020).

### 2.2    July 2009 Trial is Cancelled

On the morning of July 27, 2009—the day Petitioner's jury trial was scheduled to begin—Petitioner's trial counsel, Attorney Randall Doyle ("Doyle"), failed to appear. Doyle then appeared via speakerphone and represented that he was unable to attend trial because his uncle had died. Doyle represented that he had received a call the previous day at 4:00 p.m. alerting him to his uncle's death and that he was "told to get down to Tennessee immediately." ECF No. 31-9 at 2. He represented that he promptly flew to Tennessee, arriving early that morning. *Id*.

When asked by the circuit court what, if any, efforts Doyle had made to notify anyone in the judicial system about his anticipated absence, Doyle stated that his wife was "going to contact another attorney in the district attorney's office" to get a message to Dodge County District Attorney Bill Bedker ("Bedker"). *Id*. at 3. Bedker confirmed that the previous evening, he had received a call from a fellow district attorney who alerted Bedker that there was a "death in Mr. Doyle's family." *Id*. at 3–4. Bedker conveyed this "relatively cryptic" information to the court shortly thereafter. *Id*. at 4–5. The court prompted Bedker to "make further inquiry of Mr. Doyle" since it

---

[3]The State filed an amended information in December 2008 charging Weyker with five counts. *State v. Weyker*, 945 N.W.2d 372, ¶ 3 (Wis. Ct. App. 2020). Then, in July 2009, the State successfully moved to file a second amended information, adding eleven additional counts. *Id*. ¶ 5. One count was later dismissed on prosecutor's motion and did not proceed to trial.

"was not even entirely clear that [Doyle] would not be present and available" for trial. *Id*. at 5. Bedker was unable to get ahold of Doyle, however, and given the "lateness of the hour" and the "cryptic picture as to what was going on," the circuit court planned to proceed the following morning to trial. *Id*.

Doyle informed the court that he planned to return to Wisconsin the following day. *Id*. at 6. In the meantime, the circuit court assessed the cost of empaneling the jury against Doyle as a sanction. *Id*. at 8–9.

The parties reconvened later that day, with Doyle by phone, to determine whether the trial could be postponed to later in the week. ECF Nos. 31-10 at 2, 31-11. Despite having earlier suggested that it could, Doyle called back and informed the court that he was "stuck in Chattanooga" and "w[ould] not be" returning to Wisconsin the following day. ECF No. 31-11 at 2, 3. He represented that it was "flooding [there]" and that he "ha[d] been spending today clearing out [his] mother's house because she flooded two years ago the last time this happened." *Id*. at 2. The court again reiterated that Doyle was "derelict in [his] duties. . . in not notifying [the court] immediately upon when [he] became aware that [he was] heading out of the state of Wisconsin and wouldn't be available." ECF No. 31-10 at 8.

### 2.3 Second Amended Information

Just two days later, on July 29, 2009, Bedker moved the circuit court for leave to file a second amended information, which would add eleven counts against Petitioner. ECF Nos. 33-2; 33-3. A hearing was held on the motion on August 8, 2009. ECF No. 33-4. Doyle objected to the second amended information, characterizing it as "punitive." *Id*. at 5. "This matter . . . has been pending for over a year . . . . [T]he evidence hasn't changed, the videos haven't changed, the allegations haven't changed. And yet for

more than a year there was no . . . 16 count Information . . . . [T]he timing on this is a little suspect . . . ." *Id*. at 9.

Bedker denied this allegation, maintaining that the second amended information "gives the defendant better notice of what he's charged with" and better accounts for "distinct incidents." *Id*. at 7. Bedker stated that it was not until mid-July 2009 that he reached this conclusion, after being "able to sit down and carefully prepare," which he had not been able to do previously. *Id*. at 6. He emphasized that "[t]he goal is to have the charges track with the evidence" and that the second amended complaint better accomplished that goal. *Id*. Bedker conceded that "the reason [he] didn't file this motion back on July 15th or 16th is that [he] didn't think the Court would grant it because [the parties] were nine or ten days away from trial." *Id*. at 7. "But circumstances changed." *Id*. The rescheduling of the jury trial following Doyle's failure to appear gave the State additional opportunity to file such a motion, which Bedker argued gave Petitioner and Doyle "adequate notice [of] what the proposed charges are." *Id*. at 8.

The circuit court concluded that it was "satisfied that there [was] no retribution aspect of this amendment" and "that what Attorney Bedker did was to really take a careful look at the different videos and things that were available to him." *Id*. at 10. "[C]learly the acts constitute different crimes, and it is appropriate that the defendant be given proper notice of those crimes . . . ." *Id*. The court accordingly granted the motion for leave to file the second amended information. *See supra* n.3.

### 2.4 Trial Goes Forward

On August 24, 2009, Petitioner's rescheduled jury trial began. ECF No. 31-12. The State presented testimony of a forensic scientist employed with the State Crime Laboratory who analyzed the sexual assault kit

recovered from B.S. as well as a pair of B.S.'s underwear. *Id*. at 151, 160. The witness testified that she "detected partial Y-STR profiles on the vaginal swab," and that Petitioner was "included as a possible source to the male DNA detected" therefrom, *id*. at 165, 167, although she confirmed that if a group of 15 Caucasian males were gathered "together, one of them w[ould] match this profile," *id*. at 208. The witness similarly detected partial Y-STR profiles on "the swabbing of the inner crotch area of the underwear," plus "a mixture of three or more male individuals on the swabbing of the waistband of the underwear," and she confirmed that Petitioner was included as a possible source for those as well. *Id*. at 165, 179. The witness also testified, as relevant to the incest charges, that a paternity test established that "it is at least 21,000 times more likely to observe the profile from [B.S.] if [Petitioner] is the biological father than if a random unrelated individual male is the father of [B.S.]." *Id*. at 192.

B.S. testified that her father would touch her "[u]sually during the night when [she] was sleeping," but also in other rooms of the apartment during the day. ECF No. 31-13 at 22, 32. She described that she would sometimes wake up to find Petitioner grabbing her chest, rubbing against her, and that he "sometimes had a camera with him." *Id*. at 23. She testified that it then "became more physical" and that Petitioner would "touch [her] between [her] legs" and "have sex with [her]." *Id*. at 23–24. She could "think of over 50" incidents of "sexual intercourse . . . between [her] and [her] dad" occurring between January 2007 and August 2008. *Id*. at 34. B.S. also testified about an entry in her journal in which she wrote about how she

"might be pregnant by [her] dad." *Id*. at 25.[4] B.S. also testified that she discovered videos of "[her] vagina and [Petitioner] having sex with [her]" on Petitioner's video camera. *Id*. at 40–41.

The State then showed various videos of a female who B.S. identified as herself, including of her "shower[ing] in the milk house" and using the bathroom in the apartment, and of the sexual assaults, in which B.S. was shown nude and with genitals exposed, and which B.S. testified she did not herself film. *Id*. at 49–88. B.S. testified that she had "observe[d] [her] father making sex videos with [her]" and confirmed that she "[n]ever use[d] [her] father's digital camera to make a sex video with another man" and "[n]ever ma[de] a penis to vagina video recording with anyone other than [her] father." *Id*. at 73–74, 77. B.S. testified that she was specifically able to identify Petitioner's face in one of the videos. *Id*. at 78. She also pointed out a wristband in the video, of a type which Petitioner commonly wore. *Id*. at 87. B.S. also identified her school friend, L.D., in some of these videos. *Id*. at 80–81.

The jury then heard from Karyn McComy ("McComy"), the "registered nurse and . . . sexual assault nurse examiner" who met with and examined B.S. on July 13, 2008. *Id*. at 197, 200. McComy recounted the narrative B.S. told her regarding an incident of sexual assault that occurred July 11, 2008. ECF No. 31-14 at 5–6. She confirmed that B.S. identified Petitioner as her assailant and that, although B.S. originally said she had no previous history of "threat or assault with this assailant," she later told

---

[4]*See also* ECF No. 31-15 at 181 ("The writing in the journal stated, if I remember correctly, she believed she was pregnant at that time, and she was afraid the baby could be her father's.").

McComy that Petitioner "h[ad] done this over 50 times . . . in the past." *Id*. at 9, 11, 37.

The jury also heard testimony regarding the execution of a search warrant at Petitioner's residence on July 13, 2008. *Id*. at 57. Deputy Theodore Sullivan ("Sullivan") testified that he located two video cameras in Petitioner's bedroom, from which the above-noted videos were later obtained. *Id*. at 60–61, 64. Sullivan and Detective Michael Reissmann ("Reissmann") viewed some of the video at the time of the search warrant execution, and Sullivan testified that he could identify Petitioner as the camera operator of at least some of the videos because Petitioner "captures himself . . . with the video camera as he's placing the camera on the ground and placing the clothing around it." *Id*. at 66, 70. Similarly, Reissmann testified that he "identified [Petitioner], . . . bending over, face in front of a camera appearing to be setting it up in a restroom of the home" in the video discovered on Petitioner's camera. ECF No. 31-16 at 40.

K.B. and C.H., both seventeen years old at the time of their testimony, testified to having been at Petitioner's residence on July 2 to July 3, 2008 for a party. ECF No. 31-15 at 39, 42, 58, 64. Both K.B. and C.H. identified themselves in video captured on Petitioner's camera wherein they are shown using the bathroom in Petitioner's residence. *Id*. at 51–52, 64–65. Each confirmed that she did not know she "w[as] being recorded" at that time and that she had not given anyone permission to record her. *Id*. at 55, 66. C.H. testified that she had seen Petitioner "hit on" K.B., *id*. at 68, and both she and L.D. recognized Petitioner as "the person who set up the camera" as captured on video, *id*. at 69.

Similarly, A.D., nineteen years old at the time of his testimony, testified that he used the bathroom in Petitioner's residence in June 2008 to

change into a swimsuit. *Id*. at 71–73. A.D. identified himself in video obtained from one of Petitioner's video cameras wherein A.D. was captured nude in Petitioner's bathroom while changing. *Id*. at 79. A.D. confirmed that he did not take this video himself, that he did not give anyone permission to do so, and that he did not know he was being recorded. *Id*. at 80. His sister, L.D., who was seventeen years old at the time of her testimony, testified that she frequently visited B.S. at Petitioner's residence, and she identified herself and B.S. on video obtained from Petitioner's camera wherein each is, at different points, shown using the shower. *Id*. at 110–120, 123, 128. She also identified Petitioner, "setting up the camera," earlier in the video. *Id*. at 117, 125–26.

B.S.'s mother, Julie Schuett ("Schuett"), testified that B.S. confided in her around the July 5 or 6, 2008 that Petitioner was "having sex with her" and had been doing so for "a couple of years." *Id*. at 89, 97. Schuett testified that her response to this was that B.S. "could not go back" to Petitioner's residence and that B.S. "probably would have to come to the cops and tell them what was going on." *Id*. B.S. was allowed to return to Petitioner's residence, however, and Schuett testified that B.S. then told her that it "happened again," at which point they went to the police. *Id*. at 90.

On August 28, 2009, the jury found Petitioner guilty on eight counts—one of sexual assault of a child, one of incest, four of capturing an image of nudity, and two of attempt to capture an image of nudity—and not guilty on seven remaining counts. ECF No. 1 at 2.[5] And on March 18, 2010, the circuit court sentenced Petitioner to a term of 59.5 years

---

[5]Four of the counts for which Petitioner was found guilty were on counts added by the Second Amended Information. ECF No. 34 at 3.

"comprised of thirty-one and one-half years of initial confinement and twenty-eight years of extended supervision." ECF No. 3 at 1, ECF No. 25-1 at 2.

On October 28, 2010, Petitioner appealed his conviction to the Wisconsin Court of Appeals. On April 23, 2012, the Wisconsin Court of Appeals affirmed the conviction. *See* Circuit Court Docket. The Wisconsin Supreme Court denied Petitioner's petition for review shortly thereafter. *Id.*

On September 30, 2013, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. He purported to raise eleven grounds for relief therein, all of which asserted ineffective assistance of counsel based on myriad alleged deficiencies, including, *inter alia*, that Doyle expressly conceded during a July 2009 hearing that he needed to retain a DNA expert, but that he failed to do so; that Doyle failed to move for the circuit court judge to recuse himself in violation of Petitioner's "Due Process Right"; that Bedker "vindictively" added eleven additional charges against him after Doyle failed to appear for Petitioner's jury trial and that if Doyle had "shown up for trial on 7-29-09[,] [Petitioner] *would not* have ever been charged with these additional charges"; and that Doyle failed to investigate Petitioner's alibi and obtain evidence with respect thereto. *Id*. at 7–28.[6] Petitioner also represented that he was "currently attempting to exhaust all of [his] claims/issues in State Court" and requested that his "petition be deemed timely filed—but stayed and held in obeyance [sic] until the conclusion of [his] state court proceedings." ECF No. 1-2.

---

[6]The vast majority of those eleven grounds are not renewed in Petitioner's amended petition, ECF No. 29.

On October 2, 2013, Magistrate Judge William Callahan screened the petition and set a briefing schedule. ECF No. 3. The case was subsequently reassigned to this branch of the Court for further proceedings. On November 25, 2013, Respondent informed the Court that it did not oppose Petitioner's request to stay his petition and hold it in abeyance. ECF No. 10.

On August 23, 2016, the Court ordered Petitioner to file a status update regarding the "process of exhausting his state remedies." ECF No. 11. Counsel thereafter appeared on Petitioner's behalf and filed both a status report and a motion to extend the stay. ECF Nos. 12, 13, 14, 15.

Counsel represented that in August 2013, Petitioner filed a pro se petition for writ of habeas corpus, or a "*Knight* petition," with the Wisconsin Court of Appeals,[7] which court stayed proceedings thereon so that Petitioner "could pursue his claims in the state circuit court pursuant to Wis. Stat. § 974.06." ECF No. 13 at 1. Counsel further represented that "[o]n October 16, 2013, [Petitioner] filed a *pro se* § 974.06 motion in the Dodge County Circuit Court," and that the circuit court denied the motion without a hearing in June 2014. *Id*. According to counsel, the Wisconsin Court of Appeals then denied the "*Knight* petition on the grounds that [Petitioner] then had an adequate remedy by appealing the denial of his § 974.06 motion." *Id*. at 1–2. Petitioner appealed the denial of his § 974.06 motion. *Id*.

_____

[7]As recounted by the Court in July 2021, that petition alleged that Petitioner's "appellate counsel was ineffective for failing to raise the ineffectiveness of trial counsel in: (1) failing to seek the recusal of the circuit court judge; (2) failing to appear at the first scheduled trial date, and then failing to object to the prosecutor subsequently adding eleven new charges in the case; (3) failing to interview potential alibi witnesses; (4) failing to play, at trial, the entirety of a recording of the execution of a search warrant of [Petitioner's] home; (5) failing to move to suppress video evidence; and (6) failing to retain a defense DNA expert." ECF No. 28 at 2–3.

at 2. On April 19, 2016, the Wisconsin Court of Appeals affirmed the denial. *Id*. On May 6, 2016, Petitioner moved for reconsideration in the Wisconsin Court of Appeals. *Id*. On May 26, 2016, that court denied the motion. *Id*. On June 27, 2016, Petitioner filed a petition for review with the Wisconsin Supreme Court. *Id*. At the time of counsel's writing, the petition remained pending, and counsel further wrote that "it is possible that additional proceedings in state court may be available and necessary to fully exhaust [Petitioner's] claims once the Wisconsin Supreme Court rules on his petition for review." *Id*.

On September 29, 2016, the Court granted Petitioner's motion to extend the stay. ECF No. 16. Over the next several years, Petitioner's state proceedings continued, the stay remained in place, and Petitioner continued to file status reports with the Court. ECF Nos. 17, 18, 19, 20, 21, 22, 24. The Court ordered the action administratively closed in the interim. *See* text order and accompanying docket entry dated March 30, 2017.

Meanwhile, in October 2016, Petitioner moved for DNA testing under Wis. Stat. § 974.07 in the circuit court. ECF No. 28 at 3; ECF No. 25-3 at 3. The motion was granted, "but the results [of the testing] were inconclusive, and the motion was withdrawn . . . ." ECF No. 28 at 3–4. Petitioner also filed another § 974.06 motion, plus two supplemental motions, this time through counsel. ECF Nos. 21-1 and ECF No. 28 at 4. These motions were also denied by the circuit court, ECF No. 25-14, which denials were later affirmed by the Wisconsin Court of Appeals, ECF No. 25-15, and which denials the Wisconsin Supreme Court declined to review, ECF No. 28 at 5. As recounted by this Court in a later order, the

> first supplemental motion added a claim that "[n]ewly discovered evidence that speculum contamination could have

provided exculpatory explanation for presence of male DNA on complainant's vaginal swab." . . . [T]he second supplemental motion added the following claims: (1) ineffective assistance of trial counsel for failure to raise the fact that speculum contamination by transferring trace evidence from external genitalia provided exculpatory explanation for the presence of male DNA on complainant's vaginal swab; (2) prosecutorial misconduct/violation of due process because the trial prosecutor knew or should have known that, given the possibility of speculum contamination by transferring trace evidence from external genitalia, the trial argument that male DNA could not have been present on complainant's vaginal swab unless she was telling the truth about the alleged sexual assault was false; and (3) ineffectiveness of post-conviction/appellate counsel for failure to raise these claims on direct appeal.

ECF No. 28 at 3.

On October 20, 2020, Petitioner moved to lift the stay and reinstate the habeas proceedings, noting that the Wisconsin Supreme Court denied his petition for review on September 16, 2020. ECF No. 25. Petitioner attached to the motion a proposed amended petition, ECF No. 25-1, which the Court deemed operative, ECF No. 28, and which was later refiled in identical form at ECF No. 29. The amended petition both "omits the claims included in [Petitioner's] original, *pro se* petition that are either unexhausted or not viable" and "adds certain newly exhausted claims." ECF No. 25 at 3.

On July 23, 2021, the Court granted the motion to lift the stay, screened the amended petition, and set a briefing schedule. ECF No. 28. The Court concluded that the amended petition was timely and presented only exhausted grounds for relief, none of which appeared to have been procedurally defaulted. *Id*. Those grounds, as set forth in Petitioner's amended petition, are as follows:

(1) that Petitioner was deprived of effective assistance of counsel when Doyle "unreasonably failed to appear on [the] date set for trial, resulting in 11 additional charges" ("Ground One");

(2) that Petitioner was deprived of effective assistance of counsel when Doyle "unreasonably failed to present evidence and argue that the minute quantities of male DNA on the complainant's vaginal swab could have resulted from inadvertent contamination/transfer of trace evidence from use of the speculum" ("Ground Two"); and

(3) that Petitioner was denied due process by virtue of Bedker's prosecutorial misconduct by "making argument he knew or should have known to be false" ("Ground Three").

ECF No. 29 at 6–8. On August 20, 2021, Respondent answered the amended petition. ECF No. 31. On November 18, 2021, Petitioner moved to supplement the record, which the Court later granted. ECF Nos. 33, 38. That same day, Petitioner filed a brief in support of his amended petition. ECF No. 34. On February 14, 2022, Respondent opposed the petition. ECF No. 36. On March 16, 2022, Petitioner replied. ECF No. 37. The amended petition is now ripe for the Court's consideration.

## 3.    STANDARD OF REVIEW ON HABEAS

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA")) requires the petitioner to show that the state court's decision on the merits of his constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Brown v. Payton*, 544 U.S. 133,

141 (2005). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [those] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141. Similarly, a state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.*; *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with rather unexpected vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington v. Richter*, 562 U.S. 86, 101 (2011); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely wrong; even 'clear error' will not suffice.'") (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)).

Indeed, the petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the

benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). Further, when a state court applies general constitutional standards, it is afforded even more latitude under the AEDPA in reaching decisions based on those standards. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, Section 2254(d) stops just short of "imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* This is so because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are, however, presumed correct. 28 U.S.C. 2254(e)(1); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013) (citations omitted). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. 28 U.S.C. § 2254(e)(1); *Campbell*, 770 F.3d at 546. "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'"

*Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question de novo. *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

## 4. LAW AND ANALYSIS

### 4.1 Grounds One and Two – Ineffective Assistance of Counsel

Petitioner's first and second grounds for relief assert ineffective assistance of counsel against Doyle for "unreasonably fail[ing] to appear on date set for trial, resulting in 11 additional charges" and "unreasonably fail[ing] to present evidence and argue that the minute quantities of male DNA on the complainant's vaginal swab could have resulted from inadvertent contamination/transfer of trace evidence from use of the speculum." ECF No. 29 at 6–7. The Court first dispenses with Ground Two, which lacks even arguable merit, and then turns to Ground One, which presents slightly more substance but which nevertheless, under AEDPA's highly deferential standard, must still be dismissed.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components." *Id*. at 687. "First, the defendant must show that counsel's performance was deficient. This

Case 2:13-cv-01115-JPS   Filed 06/30/23   Page 16 of 32   Document 39

requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . . ." *Id*.

### 4.1.1 Ground Two – Failure to Make Speculum Contamination Argument

Petitioner argues that Doyle deprived him of ineffective assistance of counsel because Doyle failed to argue that the trace amounts of DNA found on B.S.'s vaginal swab could have resulted from speculum contamination. ECF No. 34 at 23–26. The Court need not determine whether this conduct constitutes deficient performance, however, because the Court is satisfied that the failure to make such argument or present evidence relating thereto did not prejudice Petitioner under *Strickland* and that the state courts' conclusion of the same was not clearly unreasonable.[8] *See Weyker*, 945 N.W.2d 372, ¶ 31 ("[T]here is no reasonable probability that, had the jury heard this [speculum contamination evidence] together with the evidence presented at trial, it would have had a reasonable doubt as to Weyker's guilt."); *see also Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

---

[8]Petitioner argues that the standard of review on this Ground is de novo because the Wisconsin Court of Appeals "either did not decide [Petitioner's] speculum contamination claims on their merits or applied a standard for resulting prejudice that conflicts with or unreasonably applies controlling authority." ECF No. 34 at 20. The Court need not decide which standard of review applies because it is satisfied that Ground Two fails on either standard of review.

The jury had before it substantial evidence from which it could conclude that Petitioner was guilty of sexually assaulting B.S. Analysis of the vaginal swabs from B.S.'s sexual assault kit revealed male DNA from which Petitioner could not be excluded. ECF No. 31-12 at 165, 167. B.S. testified that Petitioner sexually assaulted her and that he had done so many times before. ECF No. 31-13 at 22–34. An entry in her diary from 2006 corroborated that testimony. *Id*. at 40–41. The jury saw video, indisputably obtained from Petitioner's own video camera (which was found in his own bedroom), showing a penis entering a vagina that B.S. identified as her own. *Id*. at 49–88. Portions of the video obtained from Petitioner's camera also showed a man, whom multiple witnesses identified as Petitioner, setting up and obscuring the camera in the bathroom to record minors, including B.S. *Id*. at 50; ECF No. 31-15 at 78, 122–23, 128–29. Considering the totality of that which was presented, the jury had more than enough evidence before it to conclude beyond a reasonable doubt that Petitioner sexually assaulted B.S. *See Strickland*, 466 U.S. at 695 ("In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the . . . jury."). Introduction of argument or evidence relating to speculum contamination would not have changed that, nor would it have been sufficient to give the jury a reasonable doubt as to Petitioner's guilt.

Such is the case even accounting for any issues regarding B.S.'s credibility, her inability to remember specific details and dates, and changes in her story. *See* ECF No. 31-15 at 139, 148. It cannot be said that Doyle's failure to make the speculum contamination argument was "so serious as to deprive" Petitioner of a fair trial. *Strickland*, 466 U.S. at 687. At best, Petitioner has perhaps shown that the failure to make this argument "had

Case 2:13-cv-01115-JPS   Filed 06/30/23   Page 18 of 32   Document 39

some conceivable effect on the outcome of the proceeding," but the Supreme Court has expressly concluded that such a showing is not enough. *Id*. at 693. The Court will accordingly deny Ground Two with prejudice.

### 4.1.2   Ground One – Failure to Appear for July 2009 Trial

As to Ground One, some further factual discussion is needed. The reality is this: no uncle of Doyle passed away in July 2009. While someone to whom Doyle was at least vaguely acquainted did, apparently, pass away, it is not clear that Doyle actually attended that individual's funeral, nor that Doyle went to Tennessee at all. Doyle's presence in Tennessee was not immediately requested, nor was there any flooding in the area at the time, as he had represented to the Court.

Years after Petitioner's conviction, Doyle was confronted by Attorney Bruce Rosen ("Rosen") and Department of Justice Special Agent Elizabeth Feagles ("Feagles"). ECF No. 33-6 at 93–100. Rosen told Doyle that he "did not believe Doyle's explanation of going to Tennessee for a funeral, that no one in his family knew the deceased nor could corroborate his presence in Tennessee at the time of the funeral and weather records did not support his assertion of flooding in Chattanooga." *Id*. at 99. Feagles traveled to Tennessee to "interview various witnesses that . . . Doyle said would be able to corroborate he was even at the funeral on July 28, 2009." *Id*. at 98. "None of the witnesses proffered . . . could corroborate . . . that Attorney Doyle was at this funeral or corroborate the fact he was in Tennessee on July 26, 27, 28, and 29, 2009." *Id*. Feagles was advised that Doyle "did not sign in the visitor's log for those attending" the funeral. *Id*. at 94–95.

In response to this confrontation, Doyle stated that his mother had requested his presence, but he admitted that there was "no urgency to this

request." *Id*. He admitted that the deceased "was not his uncle" and that Doyle had not, in fact, "help[ed] his mother move things out of her home" due to flooding, but rather that they were merely "get[ting] ready" in case a "flood came." *Id*. Doyle admitted that "no one [could] corroborate" that he attended the deceased's funeral, nor that he was in Tennessee at all—"he indicated he does not have any airfare or car rental documents to substantiate his assertion." *Id*. at 97. He had, in other words, lied to the Court, both on the first scheduled day of Petitioner's jury trial, as well as multiple times thereafter. *See id*. at 105–06, 117–18.

Both the circuit court and the Wisconsin Court of Appeals accepted that this constituted deficient performance. The circuit court stated that it "was painfully obvious" that Doyle was "seeking adjournment because he was not prepared to proceed." ECF No. 33-16 at 9. The circuit court stated that there was "no doubt that [Doyle's] failing to appear on the first jury trial date is in fact deficient" and "certainly falls below the standards of what one would expect from an attorney." *Id*. at 10. The Wisconsin Court of Appeals did not disturb that finding, *Weyker*, 945 N.W.2d 372, ¶ 13, and neither do the parties now before the Court.

But Petitioner must also "show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . . ." *Id*. It is this element upon which Petitioner failed before the state courts.

The circuit court concluded that while it "d[id] not condone the practices that Attorney Doyle engaged in," it did "not believe that anything that Attorney Doyle did in any way prejudiced the defendant." ECF No. 33-16 at 10. "Quite the contrary," the court wrote, "this Court did allow

sufficient time between the first trial date and the actual trial date for Attorney Doyle to become adequately prepared to mount a defense to the charges." *Id*. While the circuit court acknowledged that "between the first jury trial and the actual jury trial, . . . new charges were brought," the court did not believe that this constituted prejudice as caused by Doyle's deficient performance because "[t]he information could have been amended previous to the date of the trial or even on the trial date." *Id*. at 11. "There's no demonstration that in fact the prosecutor brought the additional charges in the context of the information that ultimately went to trial as some punitive sanction to Attorney Doyle," the court wrote. *Id*.

The Wisconsin Court of Appeals agreed, concluding that Petitioner "fail[ed] to show a 'reasonably probability' that the State would not have amended the information to include the additional charges had his trial proceeded as originally scheduled." *Weyker*, 945 N.W.2d 372, ¶ 18. The court rejected Petitioner's argument that it was "unreasonable to believe that the State would have sought to file the second amended information, and that the court would have permitted the amendment, in light of [Bedker's] statement . . . that [he] had been prepared to amend the information shortly before the trial was originally scheduled to start but did not think the circuit court would grant the motion that soon before trial." *Id*. "Regardless of [Bedker's] statement regarding reluctance before trial," the court wrote, "[Petitioner] had failed to show that there is a reasonable probability that, had the trial proceeded as originally scheduled, the State, given that the evidence to be presented at trial included evidence of the additional criminal conduct at issue, would not have sought to amend the information to include the additional charges." *Id*. ¶ 19.

The Court must first determine the appropriate standard of review to apply to this Ground. Petitioner asserts that by "requiring that [Petitioner] satisfy [a] higher standard [than that mandated by *Strickland*], the state court's analysis conflicts with, or is an unreasonable application of, *Strickland*, thus mandating de novo review under AEDPA." ECF No. 34 at 19; *see also id*. ("[B]ecause the state court's prejudice analysis is contrary to or an unreasonably [sic] application of *Strickland*'s 'reasonable probability' standard, AEDPA neither requires nor permits deference."). In contrast, Respondent argues that the Wisconsin Court of Appeals' holding on Ground One was reasonable—i.e., that de novo review is not the standard here. ECF No. 36 at 9. Respondent does not otherwise address Plaintiff's contention that de novo is the appropriate standard of review for Ground One.

The Court disagrees with Petitioner, whose proposition seems to beg the question. De novo review in the habeas context is appropriate only in limited circumstances. For example, de novo review is appropriate where the state court failed to adjudicate the merits of the applicable ground at all. *See Canaan v. McBride*, 395 F.3d 376, 383 (7th Cir. 2005) ("As a practical matter, a federal court cannot apply the deferential standard provided by § 2254(d) in the absence of any state court decision on the issue . . . . AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address.") (citation and quotation marks omitted); *see also Kaprelian v. Tegels,* No. 14-C-618, 2017 U.S. Dist. LEXIS 208805, at *28 (E.D. Wis. Dec. 20, 2017) ("In this case, the court must apply AEDPA deference to the Wisconsin Court of Appeals' decision because that court rejected the petitioner's claims on their merits . . . ."). Alternatively, if shown, an

Case 2:13-cv-01115-JPS   Filed 06/30/23   Page 22 of 32   Document 39

unreasonable factual determination by the state court means that this Court must review the claim in question de novo. *Carlson*, 526 F.3d at 1024. But de novo review is not applicable merely because the lower court allegedly misapplied the relevant legal standard below. If what Petitioner asserts were true, then the exception would overwhelm the rule and render AEDPA's default deference a nullity.[9]

Moreover, "[w]hen an ineffective-assistance-of-counsel claim is presented in a federal habeas petition, a state prisoner faces additional burdens." *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020). While the "*Strickland* standard is 'highly demanding'" in the first place, in the habeas context it is even more so, because "the prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id*. at 523, 526 (first quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986) then quoting *Harrington*, 562 U.S. at 103). "Moreover, we have recognized that the more general the rule, the more leeway state courts have." *Id*. (citation and quotation marks omitted). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123.

---

[9]Petitioner's heading on Ground One states that "Doyle's Failure to Appear for Trial Prejudiced Weyker's Defense." ECF No. 34 at 17. But that is not the conclusion this Court must reach in order to grant Petitioner's petition with respect to Ground One. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standards. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court." *Harrington*, 562 U.S. at 101.

The Court now addresses the remainder of Petitioner's arguments. In so doing, the Court concludes that the state courts' determination that *Strickland*'s prejudice requirement was not satisfied was neither unreasonable nor contrary to federal law.

As noted by the Wisconsin Court of Appeals, and as conceded by Petitioner, "the State could have sought to amend the information to include the additional charges before or at trial to conform to the proof at trial pursuant to Wis. Stat. § 971.29(2)." *Weyker*, 945 N.W.2d, ¶ 18. And "[u]pon allowing an amendment to the . . . information, the court may . . . proceed with or postpone the trial." Wis. Stat. § 971.29(3).

At the hearing on the motion to amend the information, Bedker noted that "[Section] 971.29(1) allows the State to file a motion at the close of its evidence to have an Information conform with the evidence." ECF No. 33-4 at 6. He reiterated that "[t]he goal is to have the charges track with the evidence." *Id*. Bedker noted that he had "looked more carefully at the evidence" and concluded that a second amended information would "track[] directly with the video evidence" in the case. *Id.* at 7. He reiterated that his motivation was to "conform[] to what the available evidence is" and that his motion "ha[d] nothing to do with the fact that the trial got adjourned." *Id*. Doyle conceded on the record that he "kn[ew] [Bedker] c[ould] ask leave of the Court at the close of evidence in the trial" to amend the information pursuant to § 971.29. *Id*. at 9.

Bedker did indicate that he did not move to amend the information "back on July 15th or 16th" because he was wary of doing so too close to the beginning of trial as it was originally scheduled. *Id*. at 7. But Bedker also stated that his motion seeking leave to amend the information "ha[d] nothing to do with the fact that the trial got adjourned." *Id*. at 7.

It is on the former statement that Petitioner primarily relies. But nothing in the transcript clearly suggests that Bedker would have had any similar disinclination from moving to amend the information during trial as originally scheduled, pursuant to § 971.29. The fact that Bedker specifically and favorably recited that portion of § 971.29 which allows such a practice suggests that he may well have been willing to so move either during trial as originally scheduled or, for that matter, in the interim between the original and rescheduled trial dates. Bedker noted on the record that "the evidence ha[dn't] changed," *id.*, and Doyle concurred that "the evidence hasn't changed, the videos haven't changed, [and] the allegations haven't changed," *id.* at 9, therefore minimizing concern with regard to notice to Petitioner of what he had to defend against. *See generally State v. Wickstrom*, 348 N.W.2d 183 (Wis. Ct. App. 1984) (no prejudice in allowing State to amend complaint to charge an additional count based on same allegations supported by original complaint); *see also State v. De Angelis*, 423 N.W.2d 884 (Wis. Ct. App. 1988) (amendment under § 971.29 was proper where the charge added employed the same underlying facts as the original charge).

Petitioner characterizes the possibility of amending the information at trial as purely "hypothetical," ECF No. 34 at 19, but it is not entirely clear that Bedker's comments to the trial court support that characterization. Bedker was familiar with his statutory ability to move to amend the information at trial to conform to the evidence. He recounted how the "goal" of § 971.29 "is to have the charges track with the evidence." ECF No. 33-4 at 6. And he insisted that his motion to amend was "all about conforming to what the available evidence is." *Id.* at 7. It is therefore reasonable to conclude that Bedker, had he not so moved when he did and

had trial proceeded as originally scheduled, may well have moved for leave to amend the amended information at or before the close of evidence at trial. The Court cannot say that the Wisconsin Court of Appeals was "so obviously wrong" in concluding the same. *Shinn,* 141 S. Ct. at 523.

"[T]he critical question [is] not whether th[is] [court] could see a substantial . . . likelihood of a different result had [Petitioner's] attorney taken a different approach. All that matter[s] was whether the [state] court, notwithstanding its substantial latitude to reasonably determine that a defendant has not [shown prejudice], still managed to blunder so badly that every fairminded jurist would disagree." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (citation and quotation marks omitted). The Court cannot conclude, in this highly deferential context, that the Wisconsin Court of Appeals managed to "blunder so badly that every fairminded jurist would disagree" with its conclusion that Petitioner was not prejudiced by Doyle's ineffective assistance. *Id.*

## 4.2 Ground Three – Due Process Violation by Prosecutorial Misconduct

Ground Three alleges that Bedker violated Petitioner's Due Process rights because Bedker argued to the jury that "the male DNA could not have gotten into B.S.'s vaginal vault unless she was telling the truth" about the sexual assault by Petitioner, notwithstanding that Bedker knew or should have known that argument to be false by virtue of the possibility of speculum contamination, and "it is reasonably likely that false assertion influenced the jury to convict on the July 11 allegations . . . ." ECF Nos. 25-1 at 8; 34 at 22, 26–27.[10] Petitioner argues that Bedker knew or should have

---

[10]The Wisconsin Court of Appeals did not address the merits of this ground, and so the Court reviews it de novo. *See Canaan*, 395 F.3d at 383–84;

known his contention to be false because of the "state circuit court's recognition that the innocent explanation, i.e., that trace materials such as few skin cells at issue here can be transferred into the vaginal vault by use of the speculum, is 'obvious' and 'not a new concept.'" ECF No. 34 at 28 (quoting ECF No. 25-13 at 1).

As a threshold matter, the Court finds it both noteworthy and highly suspect that Petitioner does not quote any of the specific language Bedker actually used with respect to the basis of this ground for relief. Instead, Petitioner's foundation for Ground Three is a mere summary or paraphrasing of a portion of Bedker's closing argument.

It is entirely reasonable to conclude that, if a party to an action is attempting to argue that the other party's in-court statements equated to a false claim and a violation of Due Process, it would be, at a minimum, prudent to quote verbatim, in the briefing, the purportedly violative language used. Petitioner repeatedly describes Bedker as having argued "that the male DNA could not have been discovered on the vaginal swabs unless B.S. was telling the truth." ECF No. 34 at 13–14; *id*. at 20 ("[T]he prosecutor violated due process by falsely arguing that the male DNA on the vaginal swab could exist only if B.S. was telling the truth."); *id.* at 27 ("[T]he prosecutor's assertion to the jury that the male DNA evidence could not have been found on the vaginal swabs unless B.S. was telling the truth was false."); ECF No. 37 at 9 ("[T]he prosecutor's unchallenged but false claim that the DNA could not have been found in her vagina unless her July

_____

*Weyker*, 945 N.W.2d, ¶ 48 (concluding with respect to Petitioner's argument that "the prosecutor violated Weyker's due process rights by making a false closing argument that did not acknowledge possible speculum contamination" that "[b]ecause we have assumed, without deciding, that the speculum contamination article *is* newly discovered evidence, these arguments fall away.").

11 claims were truthful.") But the Court has read the entirety of Bedker's closing argument and rebuttal, and the words that Petitioner has repeatedly put in Bedker's mouth appear nowhere therein. Petitioner's characterizations of Bedker's statements are, at best, self-serving exaggerations.

Notwithstanding that Petitioner's briefing does not quote any specific language used in Bedker's closing argument, the following portion appears to be that which is relevant to Ground Three:

> Now, I'm focusing on the vaginal swabs. I'll tell you right now I don't like the way that the underwear was collected . . . . I'm focusing exclusively on the vaginal swab in this particular case.
>
> The vaginal swab was inserted inside—and this is very important—inside [B.S.'s] vagina. And I think we clarified that we went back and forth on that with SANE Nurse McComey. And she was unequivocal. I think she even demonstrated—and [I] apologize, but I recall her sort of sticking an imaginary hand-held long swab in and talking about how the speculum, if that's the right term, fully opened [B.S.'s] vagina when she did that. No equivocation on that—inside [B.S.'s] vagina.
>
> [. . .]
>
> And Attorney Doyle was correct with his cross-examining questions from a pure statistical standpoint, there could potentially be a male on this jury that shares the same profile at [sic] these loci that were found in [B.S's] vaginal swab. If you look at the numbers in the abstract. If you look at them in a vacuum. Right?
>
> But there's a gaping hole, if you look at them theoretically. Theoretically the pool, sure, could be big. Theoretically, sure, I might share the profile of those same particular loci that were examined in this case.
>
> But the giant gaping hole in the analysis is that there's only one man who [B.S.] has identified in this record has [sic]

having intercourse with her on July 11 of 2008. Got to ask yourself, well, who had access to her during the period when this DNA ended up inside her vaginal—vagina? Only one man who had unfettered access to the apartment . . . .

One man who owned the cameras. And this is where the arguments sort of run together a little bit on all the evidence in this case. Access to the cameras. And whose bedroom the cameras were found. Whose bathroom was the scene of Mpeg 7, 9, 12. Whose face, as several witnesses testified to, is seen setting up the camera in the opening seconds of Mpeg 7, Mpeg 9, Mpeg 12.

[. . .]

So when you start, okay, the theoretical pool is over 10 million. But when you put this through its paces, you examine it, you scrutinize it in the context with all of the other evidence that's been presented to you in this case, there is reasonably a pool . . . of just one. This man. Right here. Peter Weyker.

[. . .]

[T]he DNA analyst [] did indicate that DNA can come from basically anything: Phlegm, sneezing, coughing, skin cells. But I submit to you that that ignores the place where this particular DNA was found. The DNA that I'm talking about, that I argued to you on, is the DNA that was found inside [B.S.'s] vagina. Sneezing into the interior of a vagina? Coughing into the interior of a vagina is—is just absurd to think those are the mechanisms that left behind this DNA given the demonstration the SANE nurse showed you as to how she swabbed [B.S.] in this case.

The DNA that was found inside [B.S.'s] vagina was a—belonged to only one man's profile. And I made sure to clarify that. We are not talking about a mixture here. We are talking about the profile of one man.

ECF No. 31-17 at 66–69, 138–139.

To evaluate a claim of unconstitutional closing argument by a prosecutor, the Court turns to *Darden v. Wainwright*, 477 U.S. 168 (1986). *Darden* requires that the comments under scrutiny not only must be

"improper," but also must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 180–81 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

From the Court's review of the transcript, and contrary to what Petitioner represents, Bedker at no point told the jury "that the male DNA could not have been discovered on the vaginal swabs unless B.S. was telling the truth." ECF No. 34 at 13. Instead, Bedker conveyed to the jury that, in light of the extensive circumstantial evidence, the most likely explanation for male DNA (from which Petitioner could not be excluded) being discovered in B.S.'s vaginal canal was that Petitioner had, indeed, assaulted her on July 11, 2008, and that the most likely explanation was *not*, in fact, that Petitioner had folded B.S.'s laundry (including her underwear), that he had shed skin cells thereon, that B.S. had thereafter worn the underwear, transferring the skin cells to her external genitalia, and that those skin cells thereafter were transferred into B.S.'s vaginal canal by innocent means. Bedker at no point told the jury that the latter theory was impossible and could not be true. He merely pointed out that the former theory seemed far more plausible and likely in light of all the evidence the State had presented.

The Court cannot conclude, therefore, that Bedker's comments were "improper," let alone that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 180–81 (citation omitted). Accordingly, the Court will deny Ground Three as meritless.

5. **CONCLUSION**

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of

appealability under 28 U.S.C. § 2253(c)(2), a petitioner must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). No reasonable jurists could debate whether the Petition has merit. The Court must, therefore, deny Petitioner a certificate of appealability.

Accordingly,

**IT IS ORDERED** that the Clerk of Court **REPLACE** Jason Benzel with Cheryl Eplett as Respondent in this action;

**IT IS FURTHER ORDERED** that Petitioner Peter John Weyker's amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, ECF No. 29, be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that a certificate of appealability be and the same is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice.**

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of June, 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id*. A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.